**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FILED

6P

2009 FEB 25  AM 9: 26

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

---

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

**v.**

**GROUP ONE NETWORKS, INC., a corporation also d/b/a Credit Line Gold Card, The USA Workers, TheUSAWork.com, and TheUSAWorkers.com;**

**US GOLD LINE, LLC, a corporation also d/b/a USGoldLine.com, Gainesway Credit, and GaineswayCredit.com;**

**MY ONLINE CREDIT STORE, LLC, a corporation also d/b/a MyOnlineCreditStore.com, MYOnlinecr.com, Diamond Executive, NewECredit, and NewECredit.com;**

**JAMES NICHOLSON, individually and as President of Group One Networks, Inc., and Manager of US Gold Line, LLC and My Online Credit Store, LLC;**

**and**

**BRETT FISHER, individually and as Chief Executive Officer of Group One Networks, Inc., and Manager of US Gold Line, LLC and My Online Credit Store, LLC,**

**Defendants.**

Case No.

8:09 - cv - 00352 - T- 26 MAP

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

---

Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

5—1

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 - 6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, disgorgement of ill-gotten monies, and other equitable relief for defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41 - 58. The FTC is charged, *inter alia*, with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts or practices in or affecting commerce. The FTC is also charged with enforcement of the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Sales Rule, and to secure such equitable relief as may be appropriate in each case, including restitution and disgorgement. 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

## DEFENDANTS

5.      Defendant Group One Networks, Inc. ("Group One") is a Florida corporation with its principal place of business at 2300 Tall Pines Drive #126, Largo, FL 33771. Group One also does business as Credit Line Gold Card, The USA Workers, TheUSAWork.com, and TheUSAWorkers.com. Group One transacts or has transacted business in this District.

6.      Defendant US Gold Line, LLC ("US Gold Line") is a Florida corporation with its principal place of business at 2300 Tall Pines Drive #126, Largo, FL 33771. US Gold Line also does business as USGoldLine.com, Gainesway Credit, and GaineswayCredit.com. US Gold Line transacts or has transacted business in this District.

7.      Defendant My Online Credit Store, LLC ("My Online Credit Store") is a Florida corporation with its principal place of business at 2300 Tall Pines Drive #126, Largo, FL 33771. My Online Credit Store also does business as MyOnlineCreditStore.com, MyOnlinecr.com, Diamond Executive, NewECredit, and NewECredit.com. My Online Credit Store transacts or has transacted business in this District. (Group One, US Gold Line, and My Online Credit Store are hereinafter referred to as "the Group One Corporate Defendants.")

8.      Defendant James L. Nicholson ("Nicholson") is the president and owner of Group One Networks, Inc., and a manager of US Gold Line, LLC and My Online Credit Store, LLC. Nicholson resides in, and transacts or has transacted business in, this District. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the Group One Corporate Defendants, including the acts and practices set forth in this complaint.

9.      Defendant Brett Fisher ("Fisher") is the Chief Executive Officer and vice-president of Group One Networks, Inc., the Chief Executive Officer and a manager of US Gold

Line, LLC, and a manager of My Online Credit Store, LLC. Fisher resides in, and transacts or

has transacted business in, this District. At all times material to this complaint, acting alone or in

concert with others, he has formulated, directed, controlled, or participated in the acts and

practices of the Group One Corporate Defendants, including the acts and practices set forth in

this complaint.

## COMMERCE

     10.     At all times relevant to this complaint, Defendants have maintained a substantial

course of trade or business in the offering for sale and sale of goods or services via the

telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## COMMON ENTERPRISE

     11.     The Group One Corporate Defendants have operated and functioned as a common

business enterprise while engaging in the deceptive and unfair acts and practices alleged in this

complaint. Because the Group One Corporate Defendants have operated as a common

enterprise, each of them is jointly and severally liable for the deceptive and unfair acts and

practices alleged below.

## DEFENDANTS' BUSINESS PRACTICES

     12.     Defendants are sellers of advance-fee credit cards.

     13.     Defendants are also telemarketers and initiate outbound telephone calls to

consumers throughout the United States to induce the purchase of advance-fee credit cards.

### Credit Line Gold Card and US Gold Line

     14.     From at least September 2006 to at least December 2007, Defendants

telemarketed the Credit Line Gold Card.

15.    From at least November 2007 until June 2008, Defendants telemarketed the US Gold Line card.

16.    Defendants have telemarketed both the Credit Line Gold and US Gold Line "credit cards" in the guise of general-purpose, "zero interest/no fee" credit cards with a credit line of $2,500 to $10,000.

17.    In telemarketing the Credit Line Gold and US Gold Line credit cards, Defendants have aggressively targeted consumers with either bad or little credit.

18.    Defendants and their telemarketers have represented to consumers that they were calling because the consumers had recently been turned down for a loan or credit card due to the consumers' poor credit, and that Defendants were in the business of helping consumers improve and rebuild their credit.

19.    In the course of promoting their so-called credit cards, Defendants have made a panoply of representations to consumers about Defendants' credit cards, including that:

      a.    Defendants' credit cards can be used to make purchases in department stores and supermarkets, pay utility bills, or for any other purpose that a general-purpose credit card, such as a MasterCard or Visa, could be used;

      b.    consumers can receive cash advances against the credit cards' line of credit, and that Defendants' telemarketers need consumers' bank account information so that Defendants can deposit future cash advances against the credit cards' line of credit into consumers' bank accounts; and

      c.    Defendants report customers' line of credit and regular payments to the major credit bureaus, and in particular to TransUnion, and that Defendants' reporting will improve and rebuild consumers' credit more effectively than regular credit cards.

Page 5 of 22

20.     Defendants have told consumers that, to obtain the credit card, consumers must pay $200 or $250 in advance by authorizing Defendants to deduct this sum from consumers' bank accounts.

21.     Defendants have given consumers a variety of rationales for requiring the $200 or $250 advance fee. They have said it is: (1) an application fee; (2) a deposit; or (3) a way by which Defendants can ascertain the consumers' creditworthiness in lieu of performing a credit check.

22.     Defendants have told consumers that the value of the advance fee will be returned to the consumers in the form of four or five $50 vouchers that consumers can use, just like cash, to pay make their monthly payments to Defendants for items purchased with the credit cards.

23.     After consumers have provided Defendants with their bank account information, Defendants usually play a pre-recorded message that is spoken very quickly and is difficult to hear or understand. The pre-recorded message does not include many of Defendants' initial representations, such as that the credit card can be used for any purpose that a general-purpose credit card can be used.

24.     Indeed, the hard to understand, pre-recorded message has contained disclosures omitted from Defendants' initial representations, including that: (1) the credit card is actually a merchant finance account; (2) the credit card can be used only at "approved online vendors"; (3) Defendants require a down payment for items purchased with the card; (4) Defendants charge numerous fees, including a monthly participation fee in 1ˢᵗ Credit Improve, a credit monitoring program, and an "account monitoring fee" debited at three and six months after activation of the account; and (5) the advance fee is non-refundable.

25.     After playing the pre-recorded message, Defendants have recorded consumers authorizing Defendants to debit the advance fee from consumers' bank accounts.  After recording consumers' authorization, Defendants have told consumers that they will receive a package in the mail within seven-to-ten business days that contains the credit card, the vouchers, and other information.

26.     In numerous instances, after debiting the advance fee from consumers' bank accounts, Defendants have failed to mail the credit card package to consumers.

27.     Ultimately, consumers have discovered that Defendants are not providing them with a general-purpose credit card, but instead have sold them an online credit card (also referred to as an "online shopping card") that can only be used at a limited selection of catalog websites.

28.     Consumers who have visited Defendants' catalog websites have found that the websites contain a small selection of products, many with brand names that consumers never heard of.

29.     Consumers who have attempted to purchase items from the websites find that purchases carry substantial shipping and handling fees.

30.     Furthermore, consumers cannot receive cash advances against Defendants' credit cards' line of credit.

31.     Additionally, Defendants have failed to disclose material information concerning their advance-fee cards, including that:

        a.      Defendants charge consumers a $29.95 account monitoring fee at three and six months after activation of the account by electronically debiting such amount from consumers' bank accounts;

b.      Defendants charge consumers a monthly or weekly fee for participation in a credit monitoring program, 1ˢᵗ Credit Improve, by electronically debiting such amount from consumers' bank accounts;

c.      Defendants require down payments of 20% to 80% of the purchase price of items purchased with the cards, and impose substantial shipping and handling fees, all of which Defendants electronically debit from the consumers' bank accounts prior to shipping the items;

d.      the $50 dollar vouchers Defendants provide consumers in return for the advance fee cannot be combined on any one purchase or used to pay any of Defendants' mandatory down payments or shipping and handling fees;

e.      Defendants reserve the right not to report consumers' line of credit to major credit bureaus; and

f.      the advance fee is non-refundable.

32.     From at least November 2007 until June 2008, during their US Gold Line card telemarketing campaign, Defendants called, or caused telemarketers to call, consumers' telephone numbers that are on the National Do Not Call Registry.

33.     From at least November 2007 until June 2008, during their US Gold Line card telemarketing campaign, Defendants called, or caused telemarketers to call, telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the National Do Not Call Registry.

34.     In numerous instances, during the course of its outbound telemarketing operations, Defendants have called consumers who have previously stated that they do not wish

to receive calls made by or on behalf of Group One Networks, Credit Line Gold Card, US Gold Line, or The USA Workers.

35.     On or about June 2008, Defendants temporarily halted outbound telemarketing sales of the US Gold Line card.  On or about September 2008, Defendants resumed outbound telemarketing sales of the US Gold Line card using instead the name, "The USA Workers."

**Gainesway Credit and My Online Credit Store**

36.     After Defendants temporarily halted outbound telemarketing sales of the US Gold Line card, Defendants began to market Gainesway Credit, another advance-fee credit card, via direct mail advertising and inbound telemarketing.

37.     Defendants' website, www.gaineswaycredit.com, displays a picture of a credit card in the upper right hand corner.  The website states that Gainesway Credit can "Help rebuild your credit" and "Improve your Credit Score!"

38.     In or about July 2008, Defendants began operating under other names, including: My Online Credit Store, MyOnlineCreditStore.com; MyOnlinecr.com; Diamond Executive, NewECredit; and NewECredit.com.

39.     In numerous instances, Defendants have debited $149 and/or $19.95 from consumers' checking accounts by electronic debits and/or remotely created checks (often referred to as demand drafts).

40.     Defendants have debited money from consumers' checking accounts under various names, including:  My Online Credit Store, MYONLINECR.COM, and CRSTOR8774696271.

41.     In numerous instances, consumers did not give any entity authority to debit $149 and/or $19.95 from their checking accounts.

Page 9 of 22

42.     In numerous instances, Defendants' unexpected debits have depleted consumers' checking accounts, causing consumers to incur costly overdraft fees.

43.     In response to consumers' telephone calls questioning those charges, Defendants' customer service representatives state that consumers have contacted "My Online Credit Store."

44.     Defendants' customer service representatives explain to consumers that the $149 debit is the initial membership fee for My Online Credit Store's online shopping club, and that the $19.95 debit is My Online Credit Store's monthly membership maintenance fee.

45.     Defendants' customer service representatives tell consumers that their My Online Credit Store membership includes a $25,000 line of credit, and that Defendants will improve consumers' credit by reporting their My Online Credit Store line of credit and payments to TransUnion.

46.     Defendants' customer service representatives also tell consumers that Diamond Executive, a supposed third-party, is the company that enrolled the consumer in My Online Credit Store's online shopping club.

47.     Many consumers complain to Defendants' customer service representatives that they never knowingly enrolled in an online shopping club, and never gave Diamond Executive, My Online Credit Store, or anyone else, authorization to debit their checking account.

48.     In response, Defendants' customer service representatives claim they have no information about the enrollment process and only process payments for third parties, such as Diamond Executive.

49.     Defendants' customer service representatives tell consumers who request a refund either to:  (1) write a letter to Diamond Executive at 10500 Ulmerton Road, Suite 726-308, Largo, Florida 33771, requesting a "courtesy refund"; or (2) fax a copy of a police report about

the unauthorized debit, along with copies of the consumers' checking account statements showing the unauthorized debit and the signature card for the checking account, to Diamond Executive at (727) 535-8710.

50.     Defendants often fail to acknowledge receipt of consumers' "courtesy refund" request letters.  Moreover, Defendants often refuse to issue refunds and do not reimburse consumers for the overdraft fees caused by Defendants' unauthorized debits.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

51.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

52.     Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

53.     Under Section 5(n) of the FTC Act, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or to competition and that is not reasonably avoidable by consumers.  15 U.S.C. § 45(n).

## COUNT I

54.     In numerous instances, in connection with the marketing of advance-fee credit cards, Defendants have represented, directly or indirectly, expressly or by implication, that after paying a fee, consumers will receive a general-purpose credit card.

55.     In truth and in fact, in numerous instances in which Defendants have made the representation above, after paying a fee, consumers do not receive a general-purpose credit card.

56.     Therefore, Defendants' representation as set forth in Paragraph 54 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

57.     In numerous instances, in connection with the marketing of advance-fee credit cards, Defendants have represented, directly or indirectly, expressly or by implication, that after paying a fee, consumers will or are likely to be able to secure cash advances against the credit cards' $2,500 to $10,000 line of credit.

58.     In truth and in fact, in numerous instances in which Defendants have made the representation above, consumers cannot secure cash advances against the credit cards' line of credit.

59.     Therefore, Defendants' representation as set forth in Paragraph 57 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

60.     In numerous instances, in connection with the marketing of advance-fee credit cards, Defendants have represented, directly or indirectly, expressly or by implication, that they report the credit history of their customers to the major credit bureaus, and in particular to TransUnion.

61.     In truth and in fact, in numerous instances in which Defendants have made the representation above, Defendants did not report the credit history of their customers to any of the major credit bureaus.

62.     Therefore, Defendants' representation as set forth in Paragraph 60 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

63.     In numerous instances, in the course of marketing advance-fee credit cards, Defendants have represented, expressly or by implication, that after payment of an advance fee in an amount of $200 to $250, consumers will receive a general-purpose credit card and four or five $50 vouchers that can be used to pay for items purchased with the credit card.

64.     In numerous instances, Defendants have failed to disclose, or to disclose adequately to consumers, that:

a.     Defendants assess a $29.95 "account monitoring" fee at three and six months after activation of the account by electronically debiting such amount from consumers' bank accounts;

b.     Defendants assess a monthly or weekly fee for participation in a credit monitoring program by electronically debiting the cost from consumers' bank accounts;

c.     Defendants will electronically debit consumers' checking accounts for 20% to 80% of the cost of any purchases made with Defendants' credit cards; and

d.     vouchers provided by Defendants cannot be used to pay for any of Defendants' mandatory down payments on products, or shipping and handling fees.

65.     Defendants' failure to disclose or disclose adequately the material information described in Paragraph 64, in light of the representation described in Paragraph 63, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

66.     In numerous instances Defendants have debited consumers' accounts without authorization.

67.     Defendants' practice of debiting consumers' accounts without authorization causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or competition.

68.     Therefore, Defendants' practice as alleged in Paragraph 66 constitutes an unfair act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

69.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108, in 1994. On August 16, 1995, the FTC adopted the Telemarketing Sales Rule (the "Original TSR"), 16 C.F.R. Part 310, which became effective on December 31, 1995. On January 29, 2003, the FTC amended the Original TSR by issuing a Statement of Basis and Purpose and the final amended Telemarketing Sales Rule (the "TSR"). 68 Fed. Reg. 4580, 4669.

70.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(z), (bb), and (cc).

71.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

72.     The TSR prohibits sellers and telemarketers from failing to disclose truthfully in a clear and conspicuous manner, before a customer pays for goods or services, among other things:

a.     The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(i);

b.     All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(ii); and

c.     If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy. 16 C.F.R. § 310.3(a)(1)(iii).

73.     It is an abusive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to request or receive payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person.  16 C.F.R. § 310.4(a)(4).

74.     The TSR also established a "do-not-call" registry (the "National Do Not Call Registry" or "Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

75.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call

or over the Internet at www.donotcall.gov, or by otherwise contacting law enforcement authorities.

76.     On or after September 2, 2003, the FTC allowed sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at www.telemarketing.donotcall.gov, pay the required fees, and download the registered numbers by area code.

77.     Since October 17, 2003, sellers and telemarketers subject to the FTC's jurisdiction have been prohibited from calling numbers on the Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

78.     Since October 17, 2003, sellers and telemarketers have been generally prohibited from calling any telephone number within a given area code unless the seller first has paid the annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.  16 C.F.R. § 310.8(a) and (b).

79.     Since December 31, 1995, sellers and telemarketers have been prohibited from initiating an outbound telephone call to any person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered. 16 C.F.R. § 310.4(b)(1)(iii)(A).

80.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT VI (Misrepresentations)

81.     In numerous instances, in the course of telemarketing advance-fee credit cards, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the credit card program they sell, including:

      a.     that the credit card is a general-purpose credit card rather than a card that can be used to purchase items only from Defendants' websites;

      b.     that consumers will or are likely to be able to secure cash advances against the credit cards' line of credit; and

      c.     that Defendants report consumers' line of credit and credit history to the major credit bureaus.

82.     Defendants' practices as alleged in Paragraph 81 are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

### COUNT VII (Failure to Disclose Total Costs)

83.     In numerous instances, in the course of telemarketing advance-fee credit cards, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, before a consumer paid for the goods or services offered, the total cost to purchase, receive, or use the goods or services that are the subject of the sales offer, including:

      a.     a $29.95 "account monitoring" fee at three and six months after activation of the account;

      b.     a monthly or weekly fee for participation in a credit monitoring program; and

      c.     that Defendants will electronically debit consumers' checking accounts 20% to 80% of the cost of any purchases made with Defendants' credit cards.

84.   Defendants' practices as alleged in Paragraph 83 are deceptive telemarketing acts or practices that violate Section 310.3(a)(1)(i), 16 C.F.R. § 310.3(a)(1)(i).

## COUNT VIII (Failure to Disclose Material Conditions)

85.   In numerous instances, in the course of telemarketing advance-fee credit cards, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, before a consumer pays for goods or services offered, material restrictions, limitations, or conditions on the use of their advance-fee credit card program, including, but not limited to, that vouchers provided by Defendants cannot be used to pay for any of Defendants' mandatory down payments on products, or shipping and handling fees.

86.   Defendants' practices as alleged in Paragraph 85 are deceptive telemarketing acts or practices that violate Section 310.3(a)(1)(ii) of the TSR,  16 C.F.R. § 310.3(a)(1)(ii).

## COUNT IX (Failure to Disclose No Refund Policy)

87.   In numerous instances, in the course of telemarketing advance-fee credit cards, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, before a consumer pays for goods or services offered, that Defendants have a policy of not making refunds or cancellations.

88.   Defendants' practice as alleged in Paragraph 87 is a deceptive telemarketing act or practice that violates Section 310.3(a)(1)(iii) of the TSR, 16 C.F.R. § 310.3(a)(1)(iii).

## COUNT X (Advance Fee)

89.   In numerous instances, in connection with the telemarketing of advance-fee credit cards, Defendants have requested or received payment of a fee or consideration in advance of consumers' obtaining a credit card when Defendants have guaranteed or represented a high likelihood of success in obtaining or arranging the acquisition of a credit card for such

consumers.

90.     Defendants' practice as alleged in Paragraph 89 is an abusive telemarketing act or practice that violates Section 310.4(a)(4) of the TSR, 16 C.F.R. § 310.4(a)(4).

## COUNT XI (Failing to Pay National Registry Fees)

91.     In numerous instances, from at least November 2007 until June 2008, in connection with the telemarketing of advance-fee credit cards, Defendants initiated, or caused others to initiate, an outbound telephone call to a telephone number within a given area code without Defendants, either directly or through another person, first paying the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.

92.     Defendants' practice as alleged in Paragraph 91 is an abusive telemarketing act or practice that violates Section 310.8 of the TSR, 16 C.F.R. § 310.8.

## COUNT XII (Violating the National Do Not Call Registry)

93.     In numerous instances, from at least November 2007 until June 2008, in connection with the telemarketing of advance-fee credit cards, Defendants engaged in or caused others to engage in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry.

94.     Defendants' practice as alleged in Paragraph 93 is an abusive telemarketing act or practice that violates Section 310.4(b)(1)(iii)(B) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT XIII (Ignoring Entity-Specific Do Not Call Requests)

95.     In numerous instances, in connection with telemarketing, Defendants have engaged in or caused others to engage in initiating an outbound telephone call to a person who

has previously stated that he or she does not wish to receive such a call made by or on behalf of Group One Networks, Credit Line Gold Card, US Gold Line, or The USA Workers.

96.     Defendants' practice as alleged in Paragraph 95 is an abusive telemarketing act or practice that violates Section 310.4(b)(1)(iii)(A) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## CONSUMER INJURY

97.     Consumers in the United States have suffered and will continue to suffer injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

98.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of the FTC Act.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission of contracts and restitution, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

99.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers or other persons resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Federal Trade Commission, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, the appointment of a receiver, and immediate access to Defendants' business premises.

B.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

    D.    Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

                        Respectfully submitted,

                        DAVE SHONKA
                        Acting General Counsel

Dated: _2/25/09_

J. Ronald Brooke, Jr.

Stephen L. Cohen
Attorneys for Plaintiff
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
(202) 326-3484, 326-3222 (tel)
(202) 326-3395 (fax)
jbrooke@ftc.gov, scohen@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION